OPINION
{¶ 1} Steve and Donna Allison and John R. Dunkle appeal from judgments of the Clark County Court of Common Pleas which granted summary judgment against them in a property dispute.
 {¶ 2} In May 1999, the Board of Park Commissioners for the Clark County Park District resolved to commence a lawsuit for the appropriation of approximately 80 acres of railroad property for the construction of a linear park and multi-use trail. That same month, the Board of Park Commissioners of the Madison County Park District passed a similar resolution to commence appropriation of approximately 80 acres of railroad property in Madison County. The Madison County property was a continuous extension of the Clark County railroad property and was also intended to be used for a linear park and bike path. These properties will hereinafter be referred to collectively as "the railroad corridor." To this end, the Boards of Park Commissioners (hereinafter "the Boards") filed a Complaint to Appropriate Land for Public Use in the Clark County Court of Common Pleas.[1] The railroad, Consolidated Rail Corporation ("Conrail"), was no longer using the corridor at the time the complaint was filed.
 {¶ 3} The Allisons, Dunkle, and others owned interests in land adjoining the railroad corridor in Madison County and were named as defendants in this action. In response to the Boards' complaint, the Allisons and Dunkle filed answers and counterclaims asserting that they owned the portions of the railroad corridor adjacent to their lands in fee simple.[2] In the alternative, they claimed that they had acquired farm and drainage easements over the land by adverse possession. The Allisons and Dunkle sought a jury trial on the compensation to which they were entitled if the land were taken for public use, a determination that they possessed easements over the railroad corridor, and a declaration that they owned the railroad corridor in fee simple.
 {¶ 4} Conrail was also named as a defendant in the complaint. In June 1999, Pennsylvania Lines, LLC and Norfolk Southern Railway Corp. ("Pennsylvania Lines") purchased Conrail's interest in the railroad corridor. Shortly thereafter, Pennsylvania Lines filed a motion to intervene in this action and a complaint against the Boards for any damages arising from the appropriation of the railroad corridor. The trial court granted the motion to intervene.
 {¶ 5} In the ensuing months, the Boards, Pennsylvania Lines, the Allisons, and Dunkle each filed motions for summary judgment. The Boards' motion for summary judgment against the Allisons was granted, resulting in their dismissal from the case. Pennsylvania Lines' motion for summary judgment against Dunkle was also granted, resulting in his dismissal from the case. In making these rulings, the trial court determined that there was no genuine issue of material fact that Pennsylvania Lines, rather than the Allisons and Dunkle, owned the portion of the railroad corridor abutting the Allisons' and Dinkle's properties.
 {¶ 6} Allison and Dunkle raise four assignments of error on appeal.
 {¶ 7} "I. The Clark County Court Of Common Pleas Was Without Jurisdiction To Entertain An Eminent Domain Action Against John Dunkle And The Allisons Pursuant To ORC § 163.01, Et Seq., Since No Part Of Their Property Was Located In Clark County."
 {¶ 8} The Allisons and Dunkle contend that, "under the plain wording of the appropriations statute, an eminent domain action must be brought in the Court of Common Pleas in which the property sought to be appropriated is located in whole or in part." Based on this requirement, set forth in R.C. 163.01(B), they argue that the action for the appropriation of their land was required to be brought in Madison County, where their land is located.
 {¶ 9} In our view, the Allisons and Dunkle read R.C. 162.01(B) too narrowly. The statute addresses "the property sought to be appropriated" in a broad sense, from the perspective of the appropriating body, and does not, in our view, contemplate bringing actions against each affected landowner individually. Moreover, R.C. 162.01(B) expressly sanctions the possibility that a court in one county will resolve issues affecting land in another county by recognizing that the land may be in the county of the court's jurisdiction "in whole or in part."
 {¶ 10} We also note that the railroad had an interest in the land sought for appropriation in both Clark and Madison Counties. The Boards clearly were justified in bringing an appropriation action against the railroad in Clark County pursuant to R.C. 162.01(B) because the railroad's land was located "in whole or in part" in Clark County. Because Ohio law favors joinder of actions, and Civ.R. 20(A) provides that "[a]ll persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or succession or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Accordingly, those claiming an interest in the railroad corridor were properly joined in the Clark County case. The Clark County Court of Common Pleas did not lack jurisdiction to hear this case.
 {¶ 11} The first assignment of error is overruled.
 {¶ 12} "II. Appellant Park Districts Were Not Statutorily Empowered, Under ORC § 1545.11, To Bring An Eminent Domain Action Against Appellants [SIC], Since Both Park Districts Were Created After April 1, 1920."
 {¶ 13} The Allisons and Dunkle argue that the park districts were not empowered to acquire land by eminent domain. This argument is premised on R.C. 1545.11, which states: "The board of park commissioners may acquire lands either within or without the park district for conversion into forest reserves and for the conservation of the natural resources of the state, * * * and to those ends may create parks, parkways, forest reservations, and other reservations and afforest, develop, improve, protect, and promote the use of the same in such manner as the board deems conducive to the general welfare. Such lands may be acquired by such board, on behalf of said district, (1) by gift or devise, (2) by purchase * * * or, (3) by appropriation. * * * This section applies to districts created prior to April 16, 1920." The Allisons and Dunkle interpret the final sentence of this provision to mean that park districts created after April 16, 1920, do not have the authority to appropriate land through eminent domain. The Clark and Madison County Park Districts would fall into this category.
 {¶ 14} The Boards point out that three Attorneys General of Ohio have interpreted the final sentence of R.C. 1545.11 to express the legislature's intent that the provision be applied retroactively as well as prospectively, rather than that it be applied only to park districts in existence prior to 1920. Put differently, the legislative intent was to assure that the power of eminent domain belonged to commissions created prior to April 16, 1920, as well as those created after that date. Attorney General Anthony J. Celebreeze, Jr. stated in 1978: "It would be senseless to deny the power of eminent domain to a board of park commissioners created after April 16, 1920. In construing a statute, it is presumed that a reasonable result is intended. R.C. 1.47(C). Thus, I must conclude that R.C. 1545.11 applies to all park districts, regardless of the date of their creation." Ohio AG Opinion 83-020. Ohio Jurisprudence, upon which the Allisons and Dunkle rely, also reaches this conclusion. 38 Ohio Jurisprudence 3d Eminent Domain § 18 at 34 (2000).
 {¶ 15} In our opinion, it is much more sensible to interpret the final sentence of R.C. 1545.11 to express a desire to make the provisions set forth therein retroactive than to create an arbitrary distinction that would give some park districts, but not others, the power to acquire lands through appropriation. We see no principled reason for such disparate treatment, and there is no evidence of such an intention in the legislative history. Moreover, insofar as R.C. 1545.11 encompasses the acquisition of land by gift or purchase as well as by eminent domain, the Allisons' and Dunkle's interpretation of the provision would deprive park districts created after April 16, 1920 of virtually all means of acquiring land. This would be an absurd result, and it is one that we cannot countenance. It would also render meaningless other sections of R.C. Chapter 1545 which presume that the board of park commissioners has the power to acquire land. See, e.g., R.C. 1545.07. As such, we reject the Allisons' and Dunkle's interpretation of R.C. 1545.11.
 {¶ 16} The second assignment of error is overruled.
 {¶ 17} "III. The Trial Court Erred In Granting Summary Judgment For Appelants."
 {¶ 18} The Allisons and Dunkle claim that the trial court erred in granting summary judgment in favor of the Boards for two reasons. First, they contend that the trial court did not view the evidence about the ownership of the railroad corridor in the light most favorable to them, as required by Civ.R. 56(C). Second, they claim that the railroad had abandoned any interest it may have once had in the land abutting their properties and that, in abandoning that interest, ownership had "reverted" to the Allisons and Dunkle.
 {¶ 19} Some historical perspective on the construction of the railroad that runs from Xenia through Clark and Madison Counties to Columbus will be helpful to our discussion of this assignment of error. In 1844, the General Assembly of Ohio passed an act authorizing the construction of this railway and providing the means for the railroad to acquire the land necessary to do so. The 1844 Act to Incorporate the Columbus and Xenia Railroad Company provided, at Section 11:
 {¶ 20} "[I]t shall be lawful for the said corporation to enter upon and take possession of and use all such lands and real estate as may be indispensable for the construction and maintenance of said railroad, and the accommodations requisite to and appertaining unto them, * * * but all lands or real estate thus entered upon and used by such corporation, and all earth, timber, gravel, and other materials needed by said company, shall be purchased of the owners thereof, at a price to be mutually agreed upon between them."
 {¶ 21} Section 11 further provided that, if the owners and the railroad were unable to agree upon a price, they should apply to the court of common pleas of the county in which the land was situated, and the court would appoint three freeholders of the county to "value the damages" suffered by the owners. The freeholders were required to reduce their valuation to writing and, upon paying this amount to the landowners, the railroad acquired "all estate and interest therein as fully as if it had been conveyed by the owners of the same."
 {¶ 22} Pennsylvania Lines asserts that its predecessors in interest acquired a fee simple interest in the railroad corridor pursuant to the 1844 Act, and it offered documentary evidence in support of this position. Three surveyors and a tax map draftsman submitted affidavits stating that they had thoroughly reviewed the legal descriptions and title histories of the properties in question dating back as far as 1865. Each of these experts concluded unequivically that the legal descriptions of the properties at issue had excluded the land on which the railroad was situated. Moreover, the verbage in the documents purporting to exclude the railroad corridor land was buttressed by acreage calculations, which likewise indicated that the legal descriptions of the property that had been transferred through Allisons' and Dunkle's immediate predecessors in interest had not included that land on which the railroad was situated. Finally, the record contains legal records of the payment of court-ordered amounts by the railroad to the previous owners of the land in question for "damages for location and construction" of the railroad. These documents present compelling evidence that neither the Allisons and Dunkle nor their immediate predecessors in interest possessed a fee simple interest in the railroad corridor but, rather, that the railroad had acquired a fee simple interest in the land it occupied. The trial court concluded from this evidence that the legal description of the Allisons' and Dunkle's properties "specifically exclude[s] the land sough[t] to be appropriated in this case and refers to the excluded land as being occupied by the railroad, except that two of those deeds actually refer to the excluded land as being owned by the railroad." The trial court did not err in deciding that there was no genuine issue of material fact with respect to the legal descriptions of the properties.
 {¶ 23} Although the trial court's judgment and findings of fact do not specifically refer to the affidavits filed with the Allisons' motion for summary judgment, the trial court properly concluded that these affidavits did not create a genuine issue of material fact. The affidavit of John McCoy of Ohio Title Search Services, Inc. asserts that his "historical search" turned up "no reference to any acquisition of the property" by Conrail or any of its predecessors in interest. This failure to find such a reference or references does not necessarily mean that they do not exist. Indeed, McCoy's statement was refuted by the records offered into evidence by the Boards. McCoy's affidavit also claimed that "[a]ll references to the corridor referred to the railroads interest as a mere `right of way,'" a claim that was also refuted by the documentary evidence, even his own. Moreover, McCoy's affidavit was incomplete and lacking in specificity. For example, the affidavit left blank the volume and page numbers of the Official Records of Madison County where this reference to a "right-of-way" allegedly first appeared, and it did not address the legal descriptions of the property that excluded the railroad land. Further, McCoy concluded that the only interest Conrail could have acquired in the disputed land was a right-of-way and that abandonment of a right-of-way results in the reversion of the interest in the land to the adjacent landowners. While it is true that abandonment of a mere right-of-way generally results in reversion of the interest to the servient estate, McCoy cites no basis for his opinion that Conrail could have acquired — at most — a right-of-way, or his qualifications for offering such an opinion.
 {¶ 24} The Allisons also submitted an affidavit from Steve Allison in which he claimed that the railroad had ceased to maintain the railroad corridor and had "legally abandoned" it prior to 1994. He further claimed that neither Conrail nor its predecessors had ever attempted to "require [sic]" an ownership interest in the land from him and that the possessory rights of Conrail and its predecessors, if any, were "a mere right-of-way rather than a fee simple interest." Dunkle submitted a very similar affidavit. The facts alleged in these affidavits did not create any issues of material fact, and Allison's and Dunkle's unsupported, unqualified legal opinions were entitled to no weight. Even construing the evidence most favorably in favor of the Allisons and Dunkle, there was no material issue of fact as to whether they had a legal interest in the railroad corridor.
 {¶ 25} The Allisons' argument regarding Conrail's abandonment of the railroad land is premised on its position that Conrail did not own the property but only had a right-of-way, or easement, over the property. The Allisons' assert that, where an easement is abandoned, "the land is discharged of the burden and the right to possession reverts to the owner of the servient estate." Thus, the Allisons and Dunkle offered affidavits about Conrail's alleged abandonment of the railroad land. The trial court examined the evidence of abandonment and concluded that the railroad had maintained the land until at least 1994 and had paid taxes on the land until at least 1999, when the complaint for appropriation was filed. The court seemed to implicitly find that there was no genuine issue of material fact as to whether the railroad land had been abandoned. We note, however, that the issue of abandonment was irrelevant if the railroad held a fee simple interest in the land, rather than an easement, unless the elements of adverse possession were established. Although the Allisons and Dunkle claimed the land by adverse possession in their counterclaim, they appear to have abandoned this claim in responding to the plaintiffs' motions for summary judgment and on appeal. Moreover, Allison's affidavit attempts to equate the abandonment procedures used by the Interstate Commerce Commission ("ICC") when a railroad ceases operation of a line with issues of abandonment related to property ownership. The issues are not the same, and evidence of abandonment pursuant to the ICC's regulations has no bearing on ownership of real property.
 {¶ 26} The third assignment of error is overruled.
 {¶ 27} "IV. The Trial Court Erred In Refusing To Convene A Jury To Determine Issues Of Ownership And Compensation."
 {¶ 28} A trial is not appropriate if a party has failed to establish that there is a genuine issue for trial. Civ.R. 56(E). Because the Allisons and Dunkle did not create a genuine issue of material fact that they owned a portion of the railroad corridor, the trial court properly refused to convene a jury to determine the damages to which they would have been entitled if they had possessed such an interest.
 {¶ 29} The fourth assignment of error is overruled.
 {¶ 30} The judgment of the trial court will be affirmed.
GRADY, J. and YOUNG, J., concur.
[1] Some documents were initially filed in the Madison County Court of Common Pleas but, in December 1999, the Madison County court directed that all filings be forwarded to Clark County and that all future filings be made in Clark County.
[2] The Allisons were actually land contract vendees of the property abutting the railroad corridor, rather than owners in fee simple, but this distinction is not important to our discussion of the issues in this case.